We are ready for argument in our first case. Mr. McMillan. May it please the Court. My name is Stuart McMillan. I represent the appellants in this matter. We're here today on an appeal of a summary judgment ordered, entered by Judge Faber in the Southern District of West Virginia. Your Honors, this case arises really out of a construction site, and where you had a wrongful death occur at a McDonald's in West Virginia, arising out of work of a subcontractor who was retained by one of my clients, the general contractor. The whole notion behind this case was to make that subcontractor's carrier the primary insurer of this incident and this wrongful death, to assume the defense. The primary carrier in this instance would be Bituminous. Bituminous refused to accept that, and as a result, a lawsuit was filed. Your Honor, the facts of this case are like this, going into it. In the construction industry, you have a general contractor and you have a subcontractor. The general contractor here, Mulvey, retains the subcontractor, DCI Shires, whose office is located in Bluefield, West Virginia, to build a McDonald's in Bluefield, West Virginia. As part of the agreement between the two contractors, they enter into a construction agreement, very typical in the industry. A provision in that agreement deals with indemnity and the idea to procure insurance and make the general contractor and the owner, McDonald's, the additional insurer, and to make sure they secure that. That's what happened here. We have an indemnity provision in the construction contract. In addition, DCI Shires, from its West Virginia office, calls its agent to secure the additional insured status for coverage. And to do that, what they do in the industry, you have issued what they call a certificate of insurance. That was issued here. And in that certificate of insurance, it indicates that Mulvey and McDonald's are additional insurers. When you say here, you mean in this case, not geographically. Yeah, in this particular case, they were listed as additional insured as it relates to the work at the construction site of a McDonald's in Bluefield, West Virginia. Isn't there some other language? I'm not a judge. Go ahead. No, please. Is there not some other language there besides the fact that you are just an additional insurer? Does it not say this doesn't extend a policy or something to that effect? It does, Your Honor. It has a lot of information in it. The information that the parties were seeking when they're trying to start a construction project is, did we get additional insured status? And it says you are an additional insurer on the policy. It indicates what the policy is. It indicates what will happen if the policy is canceled. It has a lot of information. It does have that information about it doesn't extend coverage or provide coverage in addition or more than what coverage should be available. I don't know the exact language, but you're right. It has other language in it, Judge, when, however, that language. The reason I have difficulty understanding that is it seems like I tend to go in your direction until I look at the case law that a certificate of insurance means you're insured. But that's not exactly considered to be the case in many instances. A certificate of insurance doesn't convey or indicate you are insured if it has that particular language in there. I don't know what it does, but isn't that supposed to be sort of the majority rule? That's not really, you can't rely on that. That's the point I'm getting at. You can't rely on that to say that you are insured just because you got a certificate of insurance in most jurisdictions. Well, I would probably take issue with you when they say most jurisdictions. So you think in most jurisdictions you get a certificate of insurance that looks just like this, then you can just forget it, you got insurance? I think we could do this. I think you can rest assured that the parties, again, you're dealing with contractors. When they get this. This is critical with this reliance business. And that's why I say the cases that I saw look like most of them went the other way on. I'm not dealing with Virginia and West Virginia, but right now just the whole premise of what you have in your hand there. Well, Your Honor, there are several cases that actually take the position, exactly the position that we are taking, that what they're looking at, that they distinguish between whether acknowledgement of someone being an additional insured versus changing coverage or, for another example, would be that you have a certificate of insurance, right? That's fine. However, there's an exclusion that applies to that. And so you're not allowed, just because you have that, you don't get more coverage than would otherwise be available. I'm sorry. Please. Could I go back just a moment? You argue that West Virginia law applies. What is the factual basis for that in this record? The factual record will be as follows. DCI Shires, that's the subcontractors, office, principal office, its office is in Bluefield, West Virginia. And the reason I asked is that most of the argument in your brief seems to be devoted to showing that West Virginia has a more significant relationship with the events here than Virginia. Is that correct? But doesn't that presuppose that West Virginia law, isn't that a secondary question? Don't you have to look at West Virginia law first of all? You seem to be proceeding, what I'm trying to say is, on the assumption that Virginia law would apply in the absence of this significant relationship. Your Honor, I'll state what our position is, and if I'm unclear, I apologize. Our position is this, that under the conflicts of law, West Virginia substance of law would make that determination. Right. The law of West Virginia is essentially the formation of the contract and the location of the insured. If those two are the same, that state law would apply. If they are different, in other words, the formation of the contract is different from the location of the insured, you would go down what we call the significant relationship test. It would be, you're absolutely right, you don't get into that unless, in my view, and I think the case law of West Virginia, there's a discrepancy between the formation of the contract and the actual location of the insured. And what I was getting to is my concern or question, the district court treated, the district court applied Virginia law on the ground that that is where the insurance policy was issued. That is correct. Is that correct under West Virginia Lex Loci Contractus? I think that is. I mean, the interpretation of insurance coverage in West Virginia is treated as a contract question, right? Yes. For purposes of conflicts. In conflicts, contract conflicts law in West Virginia, as I have read it, seems to conclude that a contract is made at the time when the last act necessary for its formation is done. That is the current case law of West Virginia. Yes, Your Honor. And is that the state of issuance as the district court concluded? No, Your Honor. Why not? Because the last act is the insurance policy was opened, put in there, whatever you do with insurance policies, in West Virginia at their office. Okay, but if there were no changes, and I'm interested, the record's really confusing here. Maybe you can help us. Brown and Brown asked to make certain changes to the policy. The letter shows it, Joint Appendix 46. What were the changes that Brown and Brown requested, and were they material to the contract? And why wouldn't that affect the analysis as to what was done? In other words, the agent for DCI was asking for changes. So we don't know, without knowing exactly what was done, how do we know where the contract was finally issued or accepted? Yeah, Your Honor, I would. What were the changes? The changes, if you're referring to, and I don't have that specific document in my brain right now. It's a document in the record. Is there a document? Which document? Is the document that you're referring to in response to Judge Keenan's questions about the changes that were requested in the record? As it relates to the adding Mulvey as an additional insurer, I don't have. No, her question was, what changes was the agent for DCI requesting? And they're asking in their PS here in this letter, and maybe this will help you. They're asking in their PS, upon review of your policy for accuracy, we have found that the following corrections need to be made. We are requesting these changes. Add contents coverage to location limit 5,000, add general liability coverage and employees' benefits liability coverage to location 2. Okay? Now, were these changes made to the policy? The record doesn't seem to show that. And second, were these material to the party's bargain? We don't have any way of knowing this, as best I can tell from this record, unless you can point me to another place in the record that shows whether these changes were material and whether they, in fact, were made. I don't know if there's anything in the record about those specific changes. Well, then, how can you have a contract? If these are material changes and we don't know if they were made, how can this court rule on whether the parties formed a contract based on this record? Well, Your Honor, I think in the context, I don't think there's an issue that there was an effective insurance policy. Well, what's location 2? Does the record show what location 2 is? You're talking about the various portions of what was actually covered? Well, no, I'm talking about the brown and brown letters saying these changes need to be made to the policy, essentially saying in order to have a deal, these changes have to be made. And one was that you have to add liability coverage and employee benefits to location 2, and the second is you have to add contents coverage to location 1. Well, what's location 1? What's location 2? Are these changes material? Because, see, if they are material and they weren't made, then what do we have to decide here? You see what I'm saying? We don't have evidence of even a completed contract if these changes were material and weren't made. Which goes back to the problem I'm having about applying West Virginia law, West Virginia conflicts laws to determine the appropriate substantive law. I can't tell where this contract was consummated. And the district court's finding that it was issued in Virginia doesn't end the inquiry for my purposes. Right, Your Honor. Let me just say this, and I understand, Judge Keenan, your concern, some of which I don't know the actual date of that letter. October 1, 2002. Okay. This is what we do know in the record, is that there is a contract that was in place between DCI Shires and its insurance carrier, Bituminous. The issue that Judge Duncan is looking at is what evidence do we have to support where the policy was formed? Because that's one of the threshold issues the court needs to decide. I look at that based on the affidavits that are in the record dealing with the last act. Right. But if there were changes, and I don't mean to cut you off, but if there were changes, that's a counteroffer. If there were changes required, it doesn't matter where the first one was opened. If Brown & Brown is telling its client, DCI, in this October 1st letter, you've got to have these changes. We need to know what happened to those. It doesn't matter what they opened in West Virginia in the first instance. If Brown & Brown is saying these changes have to occur and DCI agrees these changes have to occur, then they become a counteroffer in the insurance context. We do know there had to be some agreement because we have a policy. We have an effective policy that was in place. I don't think that's really disputed at all. In an insurance policy, changes are made routinely through the life of a policy. You need to add this. You need to add this. In this example, you're talking about adding an additional insurer, for example. That's a change in a policy. There are changes in the record. The records show, again, I don't mean to beat the dead horse, but the record has to show that these changes were made and that once they were made, for your position to prevail, don't they have to show that these changes were delivered in West Virginia? Well, to the extent that the policy was delivered in West Virginia, again, dealing with an insurance policy and endorsements that are provided, the evidence that's undisputed is that those were actually whatever changes they were made, they had to be accepted because we had insurance in place, and they had to be what the record shows, that they were affidavits that said that's where we opened our mail, that's where we looked at our insurance policy and put them in a particular place and stored them. This is where we paid premiums from. Right, but let me just ask one other question. What we're dealing with here is a renewal policy, not an original policy, correct? That is correct. And the original policy isn't in the record, is it? I think there is the original policy itself. I believe that is part of the record, Your Honor. Well, when you sit down, don't do it now, but when you sit down in time for rebuttal, I'd appreciate it if you checked that, because that wasn't my impression. But in any event, does that make a difference to our analysis, that what we're dealing with here is a renewal? I don't think it does. I think what we're dealing with here is when you're dealing with the insurance policies, and unlike other types of contracts, I mean, they're unilateral contracts. They're written by one party. But basic insurance law treats a renewal differently than it treats an initial application, because isn't the insurer then making the offer in the context of a renewal as opposed to the acceptance when it issues the policy? That's fair enough in the sense that when you have a renewal, effectively you have a new policy, but the terms of which are typically the same. The premiums may change, but the terms of which are typically the same. I'm sorry. I think it's the same. In terms of the formation, the meeting of the minds with respect to the renewal, it's a different analytical question, isn't it? As opposed to the original contract and then the renewal of a contract in terms of meeting the minds? Yes. Is that the question? Yes. I don't necessarily see that to be the case. In terms of the renewal, what was the offer and what was the acceptance? It's usually the payment of premiums. No, in this case, what was the offer and what was the acceptance? I think it would be essentially here's your policy and here are the premiums. It would be based on this would be the amount of premiums and this is the amount of coverage. That would be the offer, and the acceptance would be the payment of premiums. Do you have any West Virginia law to support that or any case law? Well, I think that's what the affidavits were looking at when they were submitted in the record when Judge Faber was asking about the formation of contract. He was looking for questions like that. Where did you pay the premiums? Where did you actually open up? That was in the context of significant whether once you determine that there was a contract formed under Virginia law, did another state have a more significant relationship? With all due respect, I don't think the contract, the point of this evidence, the contract was not formed in Virginia. Well, the district court found as a fact that the policies were issued in Virginia. That's true. What my question is going to is the factual basis for that under West Virginia law, which doesn't seem to turn on issuance. I think that the term that West Virginia law uses is formation of contract. Thank you. I did want to make, I think this case has some very significant issues in it dealing with estoppel due to defend and I probably would get there somehow even with the statute of limitations, but I want to understand at least where we are on what we've just discussed. Is there agreement between the parties that West Virginia's choice of law applies in determining what law applies? In other words, the choice of law applies and that's how we get to the Georgia technology, this case. Is there agreement on that? Yes, I think that the law is that the West Virginia's substance of law would control choice of law. Yes, Your Honor. Then we use the Georgia technology case primarily, it was another one triangle or whatever, to determine which state is the state in which we then look to determine what law applies here and that's where we get into the business of the formation of the contract under the Georgia technology case unless, as Judge Duncan pointed out, you can show significant relationships with West Virginia. Your position, I guess, is twofold. First, there's no formation, but if there is, there are these significant relationships. It is, Your Honor, and again, I don't have much time and I'll try to answer the best I can because I wasn't doing a very good job earlier, but our position is this, and may I proceed? I think I'm over my time. Yes, finish your sentence. What our position is, Your Honor, is that under the formation of the contract, West Virginia law basically, and especially when you're dealing with insurance policies, it looks at the last act that was done by the party. In this instance, usually looking at a payment of a premium, opening up, looking at the contract. Our point also that's very important in this is that the actual insured, DCI Shars, was located in West Virginia always. And so our point of this is that the insured resided in Virginia. The company was receiving mail in Virginia at the post office. There is no doubt that DCI Shars had a post office box in Virginia. That is correct, Your Honor. It directed its mail there. It directed its mail there, but acceptance. How can you say that has no significance in this case? I think it's relative. I think that where someone lives beats a post office box every time. But you're going into significant relationship, and I think the question is still devoted to figuring out where the contract, where the last act necessary to form the contract is as a threshold. Where I really was trying to go was the formation of the contract. Thank you, Your Honor. You have some time for rebuttal. Okay, thank you. Mr. Levikoff? Yes, may it please the Court, Avram Levikoff. I represent Petunias in the case. I have 15 of the appellee's 20 minutes, so let me get right into it. To respond first to Judge Wynn's question, and let me add, I'm not surprised my opponent can't remember the disclaimer wording in the certificate. His whole case is predicated on disregarding the disclaimer wording in the certificate. It's quoted on page 5 of our brief. I can read it in toto. It starts out in big . . . It goes to the reliance aspect of it. It goes to the reliance, and it goes to the entire predicate for this case. Why don't we deal with the issue that has been discussed so much in terms of the threshold question here? The choice of law. The choice of law. Is that West Virginia? The choice of law. Because the case was brought in a West Virginia district court, and it is a diversity case, the West Virginia conflicts of laws rules apply, as articulated in Joy. Which is what they say. Right. So you agree on that aspect? Yeah, absolutely. And Joy clearly adopts lex loci contractus. I'm going to talk about some of the policies underlying lex loci contractus in just a minute. But I must say that while the Joy case in the syllabus point, and of course in West Virginia, it is the syllabus points that articulate the law. It's a single syllabus point, and it says, in effect, the law applicable to an insurance policy is the place of contract formation. And I'm going to get to what formation means. Because I can see some remarks need to be made on that. But I would suggest that the court examine the Neal case that we cite in our brief, citing Lee versus Saliga that we cite in our brief, two West Virginia cases that, as I read them, equate in the case of typical insurance in today's world, they equate the place of formation with the place of issuance of the policy. And I'll explain why in just a second. But I suggest that those two West Virginia cases stand for that principle. Does it make a difference whether it's a renewal or not? No, and I will explain that. Well, I'm going to explain how renewals work. If the court looks at the full constellation of choice of law cases in the insurance realm, virtually every court looks at the place of issuance of the policy as the place of formation. And here's why. Here's the way it works. This is commercial liability insurance. It is not life insurance. It is not auto insurance. In those kinds of insurances, in order to secure the issuance of a policy to bind coverage, the policyholder must tender a check. And the cases cited by my opponent in his brief essentially stand for that proposition. Here's how commercial liability insurance works. The insured goes to an agent. In this case, they picked an agent located in the state of Virginia, brown and brown, and they fill out an application, which is about a seven- or eight-page form. The original application and the original policy, I do not believe, are in the record. But the policy that is the relevant policy in this case is the one that afforded coverage for the period May 20, 2002, May 20, 2002. This becomes very important. And it ran for one year until May 20, 2003. The accident occurred in January of 2003, hence it was within the confines of that policy. The original application would have been submitted through brown and brown. It would have been underwritten by brown and brown and bituminous. And a determination would have been made as to whether they would issue. And then once the determination to issue was made, the physical policy, the papers would have been created essentially via computer through brown and brown, and ultimately later on mailed out. And I'm going to get to that. In the case of the renewal, the procedure is essentially similar, except they have a template to work with. They have the prior policy to work with. But nonetheless, in the case of a renewal, the insured goes to their agent, in this case the Virginia agent brown and brown, and they fill out a renewal application. And Judge Keenan, that is in the record. And it's clear in the record that this was DCI applying for renewal of the coverage, DCI listed in the application as a Virginia corporation. And it doesn't just get mail in Virginia. It is registered here. It is chartered here. It lists its corporate address here in Virginia. Mr. Lavikoff, I'm sorry to interrupt you. It's just that you have done what my concern is that Mr. McMillan was doing also, and that is moving from the issue of contract formation per se in the first instance to an analysis of other significant contracts. And I want to take you back to your statement that the question is normally one of issuance. Where it issues, right. So interrupt. Is normally one of issuance, and that is normally the case. It does not seem to be the case in West Virginia. And I will read to you. A contract is made at the time when the last act necessary for its formation is done and at the place where the final act is done. And generally a contract is considered as entered into at the place where the offer is accepted or where the last act necessary to complete it is performed, which is, let me finish, which is not synonymous with state of issuance. It is synonymous for this reason, and I'll backtrack to that case. As I indicated, and I got off point, there is a renewal application submitted through the agent. It is passed along to the insurance company via computer typically, and the insurance company will decide to issue. So the offer is the application. It is in the record. The acceptance is made by the carrier by issuing the policy. What if the insured counters? Rejects the policy? Counters. It says you need to do this, this, and this, which it appears is what happened here. I think not. The letter that was referred to I believe related to the coverage provided under the prior policy, I think it was in April of 02. October of 02. I apologize. October of 02. Do we know whether those changes were made? That would be treated as a request to amend the policy. Is it counteroffer? No. It would be treated as a request to amend the policy. Why is it not? What is your authority? What is your authority for that proposition? That policy has been in effect since May 20th of 2002. This would be five months later. And, again, that coverage is in place from the moment the policy issues. The effective date of coverage here, and I said that was important, is May 20th, 2002. That liability coverage, as it is, would be in effect the entire period from May 20th, 2002. Did the insured not decide that the terms were unsatisfactory and the insured is going to reserve payment of premiums pending the negotiation of different terms? Payment of premiums is a whole different problem, and I'll talk about payment of premium as well. But when that policy goes into effect on May 20th, 2002, coverage is in place. If the insured wants to reject the policy, the insured simply gives notice of cancellation. What's the whole point of this Brown and Brown letter? Shed light on that for us. October 1st, five months after the policy was issued, there's this letter to DCI, and Brown and Brown being the agent for DCI, saying you need to make these corrections. How does that fit into your analysis? How do we know? Well, when the insured comes back for any reason, first of all, if the insured doesn't want the coverage, they cancel. And there are cancellation provisions in the policy. They cancel, any accrual of earned premiums stops right then and there. Secondly, changes in the policy, there are provisions in the policy which govern changes. The insured simply comes back and says we don't want this, we do want that, we want to change this amount. That is a request to amend the policy. The insured either, the insurer either agrees or doesn't agree, and there will be a change endorsement. There's a variety of different kinds. If the insurer doesn't agree, do you still have a contract? If the insurer doesn't agree to a change, then the insured has the option. They can either live with the policy as it is without change, or they can cancel. And they can go elsewhere. They can try to re-underwrite with the same carrier. But the key point here is, and none of the changes that are addressed in that letter have any bearing on this situation, which is simply was an additional insured added or not? And, of course, they were not. Hence, the effort to remind you. It may, if the reading, a plausible reading of the cases that I read to you, quoted to you from, indicate that West Virginia defines a contract formation as occurring at a different point than issuance. And it may be very relevant because West Virginia recognizes reliance and estoppel interests, and Virginia does not. So it could very well have a considerable bearing on the issue regarding the language. That is correct. But, again, the application is the offer to contract. The issuance of the policy is the agreement to contract. That forms the insurance contract subsequent to any subsequent revisions that the parties may make pursuant to the terms of the contract. And there are provisions. There's a changes provision in this policy which addresses how changes are made. It says it has to be documented by endorsement. But back to formation. When that policy issues, that forms the contract. Consequently, I suggest, again, that the more recent- Your position on the West Virginia law is that issuance is the same as formation. Absolutely. Neal and Lee v. Saliga. And the case that Judge Duncan, I believe, is referring to, very old, 1960-something. Actually, I think it was cited by- It's older than that, I think. It might be. I don't go back that far. I go back a long way. It was cited by this court in tow. But these are old cases. Although the cases that you cite aren't commercial liability cases. They're uninsured auto insurance cases where it may very well be that I don't expect to negotiate with Nationwide for my car insurance. I expect it to be take it or leave it. But this is a commercial liability context with two business entities which do have marketplace power and the ability to negotiate. They are different kinds of policies. I actually do not think the market power is markedly different between the two. I will say that in my experience, commercial liability underwriters are more willing to make revisions than auto carriers. In certain instances, nonetheless, the procedure is the same. Application, issuance. Application for renewal, and that application is in the record. Application for renewal, issuance. And in fact, I don't have the record reference, but it's in there. We quote liberally from the application for the renewal policy because, once again, it identifies the policy holder as a Virginia corporation. So in that sense, it does have significance in the context of a renewal because it is the insured that is applying for renewal. Absolutely. And as this insured did, and by issuance, effective May 20th, that coverage is in place. And I might add, the insured in this case, or Maldy in this case, argues for insured status, argues for the formation in West Virginia because the policy, although mailed to the Virginia corporate address of DCI, is lifted out of the mailbox, carted across the border into West Virginia, opened in West Virginia. I can't imagine an argument that is one any less supported by the case law that where they cart that policy becomes the applicable law. The reason he argues for that is because the law is somewhat different. Better for him. And so the question, when you get into this whole business of estoppel, when you're looking at the two states, I don't know if it's an agreement that Virginia clearly is not in the same realm as West Virginia. I'm not sure we're there. We haven't even discussed that. But it seems to be assumed that we've got to decide which state because they are different. Indeed. And that's an assumption that I'm not sure is true. West Virginia clearly has a position on it, but I'm not sure Virginia is as clear as we probably are assuming it is in this conversation. Shenandoah suggests that- Because if there's no difference, you wouldn't care which state it is. The Shenandoah Life case that we cite suggests that you look to the disclaimer and the certificate is of no moment. The authorities in virtually every state, as Your Honor pointed out, except West Virginia, hold that way. So I'm comfortable the court- But it's not clear in Virginia. There's no Virginia case on point that deals with a certificate of insurance type situation. There's one that deals with exclusion, deal with other matters, but not certificate of insurance in this kind of a way. Shenandoah Life gets pretty close, though. It's an indicator. That, together with the majority of jurisdictions, Appleman, goes the other way. Your Honor, I'm confident the court will get that prediction of Virginia law right. But back to this argument. I cannot imagine a position that is any more antithetical to the precepts of- Your time has long expired, and you're not, at the moment, responding to a question. So if you would, in a couple of sentences, conclude, that would be great. I can't imagine an argument any less consistent with the principles of predictability, uniformity, and consistency that are supposed to underline lex loci contractus than the argument that when the policy's in the mailbox in Virginia, and they pluck it out and take it over to some office in West Virginia, that that creates a touchstone for West Virginia law. Thank you. Thank you, Your Honor. Mr. Willett? May it please the court, Henry Willett here today on behalf of Brown and Brown Insurance Agency of Virginia. Although there were five counts initially brought against Brown and Brown, the only one that we're here on today is count five, which the district court dismissed on statute of limitations grounds. And that was a third-party beneficiary breach of contract claim. I will hopefully bring good news to this court in that I think this conflicts of law analysis is far more straightforward than the one that has been debated thus far today. Specifically, the court ultimately held in that case that Virginia's three-year statute of limitations time period for oral contracts applied. Now, what we can agree on, what the parties have agreed on, is that in determining the applicable state statute of limitations, the court will look to the conflicts of law rules of the forum state. And as agreed earlier, that in this case would be West Virginia. In this instance, when you're looking at a determination as to statute of limitations, that is generally regarded as a procedural matter. Here's where we deviate. In West Virginia, there is a borrowing statute. That borrowing statute has been held in district court cases as well as state of, as well as state supreme court cases to apply to determinations such as the one to be made in this matter. Is there an arbitration proceeding here? The arbitration proceeding that was alluded to in the reply brief has nothing to do, does not involve Brown and Brown Insurance Agency of Virginia, and does not involve Bituminous either. There was an arbitration in New York. In the context of the indemnity contract, I mean, because Brown and Brown only gets in if there's some form of liability here. And it would seem if the underlying basis for liability is being told, why wouldn't that affect you? If the underlying basis is being told? Well, the only key- I mean, if they're not liable, you're not. Well, I guess that's a fair point, but I don't even think we have to get there. There's no action. If they, you know, if arbitration told it, then there's nothing for you to be concerned about. Well, presumably there would be no damages in that instance. I mean, their breach of contract claim is that we failed to do something we were required to do. Brown and Brown failed to do something that we were required to do based on an oral contract with DCI. Therefore, those allegations are wholly unrelated to the contract that exists between DCI and Mulvey. But your point is well taken. If there were no damages in that underlying arbitration, then presumably there could be no damages for whatever actions or inactions Brown and Brown is accused of doing or not doing in the underlying action. So does it toll it? It does not toll it. The only cases- a couple points with respect to tolling. First and foremost, this argument, creative as it may be, was not addressed in their initial briefing. And I think under Federal Rule of Appellate Procedure 29, I think it's therefore waived. They do bring it up in the reply brief. And the cases that they cite and they rely on were cases that involved the parties to the litigation. Meaning, in one case, there had been litigation or there had been an arbitration and then, I guess, litigation, then an arbitration, and then ultimately litigation again. And therefore, that was sort of a logical situation to toll the statute of limitations because the parties of interest were involved in that arbitration. Here, Brown and Brown had nothing to do with the underlying arbitration. It was not a party to that arbitration. So I think that that case, I think for both of those reasons, the fact that there was a waiver of that argument and because those cases in Virginia that have applied tolling have only applied it where the actual parties are of interest in the arbitration, I don't think that that argument holds water here. Shifting back for just a second to this idea of the borrowing statute, that statute specifically provides that the period of limitation applicable to a claim accruing outside of this state shall be either that prescribed by the law of the place where the claim accrued or the law of this state. The facts that are relevant to this analysis are these. In the complaint, it's asserted that DCI and Brown and Brown entered into an agreement by which Brown and Brown was to secure liability coverage for Mulvey and that appellants were a third-party beneficiary to this argument. This argument is clarified in the briefing to say that what we've all heard today, that Brown and Brown was to add or make sure that Mulvey was added as an additional insurer and that the breach was Brown and Brown's failure to act, failure to do something, and failure to make sure that this happened. At all times relevant to these allegations, both Brown and Brown and its representatives, the ones charged with acting here, were located in Virginia. Accordingly, any failure to act by Brown and Brown occurred in Virginia and therefore Virginia's shorter three-year statute of limitations period should apply. That concludes my argument unless the Court has any further questions for me. Thank you very much. Thank you. Mr. McMillan. Thank you, Your Honor. And I appreciate additional time. A couple of points I want to follow up. I was unable to tell which policy, the original policy versus renewal, was in the record, Your Honor. I can't discern that from what I'm looking at. Secondly, and I understand where the Court is coming from with respect to the conflicts of law, I do believe that the Court is charged with trying to determine where the contract was formed. It is sometimes difficult to do that when you're talking about insurance policies, whether they're commercial or auto. But I will make this last note on that, is that one thing is very constant throughout this process, and that's the actual physical location of the corporation. And that is a key component to the conflicts of law analysis under West Virginia law. And that was the same in 2002 and throughout. It doesn't matter that it's a Virginia corporation. It's my view of it. That's not relevant at all? Well, I can't say that it's not relevant. Again, but I think what we'd be getting into would be some of the significant relationships type criteria where you're weighing them. What I'm simply addressing at the outset, what the Court is citing in the case law, is where was this contract formed? And truly with insurance policies, and unlike some contracts where Joe and Tom meet and they hash out a contract in someone's office and they sign it. We don't have that here. Mr. Levikoff says it's place of issuance. He's not correct at that. They're not the same. And I don't even really know exactly when you say the issuance. I think the party and the way the case law is looking at it is what acts actually. What is the case law you're relying on? The case law, it starts with Liberty Mutual. It also has Joy Technologies. But the specific case she cited, I believe, is the Toe opinion, which is the opinion that is still law in West Virginia, where she is articulating the law about, okay, the last act. What happened? Someone's trying to figure out how the contract was formed. Where was it formed? Where did that take place? That's why I was trying to figure out whether there was a counteroffer. Right. I don't think an insurance. You believe these changes weren't material? I don't think. When I start thinking about it, you're dealing with an insurance policy. We all have insurance policies. Here's your insurance policy. I don't think it was one of these situations where there was a lot of give and take, frankly. I think the give and take is what the premiums are. And so we have evidence in the affidavits about where the premiums were paid and so forth. And what the court is struggling with is what was, where was it formed? Where did it actually take place? And the only evidence in the record regarding that is really confined to three affidavits submitted by the insured about where they did what they did with the policy. What is the language in the case law about where the offer is accepted? Because the seminal case, what appeared to be the seminal case in case law that is, as Mr. Levekoff pointed out, generally pretty old, is that a contract is considered as entered into at the place where the offer is accepted or where the last act necessary to complete it is performed. And that was my question. How you determine when someone accepts an insurance policy? Well, it depends on what the offer is, too, doesn't it? Well, basically, here's your policy. You've got a million dollars' worth of coverage, and this is what it covers, and this is what excludes. They write the policy, and they say, here it is. You're saying the application isn't the offer. No. No. I think, no, I think the way it works is, I mean, obviously the application. You guys don't agree on the law at all. I mean, I haven't heard. Yeah, if only a few moments. We certainly don't agree on the law, but one thing that Judge Wynn picked up on, I know we're putting a lot with conflicts of law, but I firmly disagree that Virginia somehow has squashed this whole estoppel argument. And how Shenandoah says it, I don't agree with that. I think that Virginia has not fully addressed it, but I do think for the court in this particular instance to say it's unreliable, it's unreasonable as a matter of law to rely on that, I think that is taking things out from the jury. I think those are questions of fact at the very least, but I do think there's a plethora of cases out there that do recognize this concept of estoppel. Your opponent said, at least the lawyer on the other side, says that he's confident we can predict what that law is. I think I have all the confidence in this court. Why would we predict it? Should we certify a question like that to Virginia if we find that that's the appropriate form? I think if, in fact, it's conflicts of law, that's obviously something at the discretion of the court. However, I do think that general basic principles of agency and about, I mean, there are Virginia cases that talk about how an authorized agent of an insurer can bind the insurer. So this isn't a huge step from that basic concept. Estoppel is an equitable doctrine. There's no contract. Some question is whether Brown and Brown is an agent, isn't it? I mean, they are brokers. Oh, there's no question. They represent many companies, and they do have a contract with the terminus, but in terms of whether it is an agent that fits under the you have authority to do certain things for me, is that as clear as in a case where you have an agent for that particular company? Good distinction. However, I think it is very clear based on the agency agreement in the record and the fact that bituminous specifically authorizes Brown and Brown to issue certificates of insurance. So, yes, to the extent that there's a specific provision allowing that, I think it's very clear that Brown and Brown is the authorized agent of bituminous, and its acts and representations can bind bituminous. And we believe that principle is well established not only in Virginia but throughout the country. And for that reason, I don't think this court, in terms of predicting, looking at some of the Virginia cases, that it would necessarily be a stretch by any shape of the imagination. To prevail on that, do you still have to show that the other side reasonably relied upon it? I think it depends how the court rules. I mean, some cases are very matter-of-fact about what the certificate of insurance means. I mean, you could actually have a jury trial on that issue, certainly, and say here are the elements and so forth. In the industry, you've got these big companies, and it's sort of understood you get a certificate of insurance, and it's kind of understood that's not insurance, that's just whatever it is, it's not insurance. And that seems to be what I keep hearing is the majority rule? Because there are a lot of cases that say that. Well, I think you have to kind of, if you kind of weed through them and see what they're talking about, what the principle they're talking about is you can't use a certificate of insurance to extend or enlarge coverage that doesn't already exist. And we are not doing that in this instance. Is that Virginia law? Sorry? Is that Virginia law? I think Virginia law recognizes that. I think West Virginia recognizes that distinction. Georgia recognizes it. North Dakota recognizes it. Those are some of the cases. I thought West Virginia clearly said if you issue that certificate of insurance, you can be stopped. That's the problem we've got here. You say both of them do it. You just gave me Virginia law on it. Is that right? Not West Virginia law. Well, West Virginia, what it does is in making that proclamation that the certificate of insurance does exactly what it does, what the court distinguished was, hey, we recognize you can't change the coverage or enlarge the coverage, but by gosh, in this instance, you can be insured under the policy. And those are two distinct issues. And, Your Honor, I do think that's the distinction here. And I think that if you look through the cases, that's where the distinction lies and where the cases are coming down. And so that is an issue, though, we never got to. The circuit judge, I mean the district court judge, disagreed with us and said it was unreasonable as a matter of law to rely on that. And we respectfully disagree. We think if you took this to the streets of Richmond and said, do you think you're an additional insured when you get this document, I bet you most people. That's not where it plays. These are sophisticated companies. You can get into companies, big companies, and Mars and others. Well, they're not erudites of the law. They're contractors. They're good at working and doing so. When someone gives them that, they think they are an additional insured. So to that end, I do think that I wouldn't put them in such a light. Because, frankly, when I look at that and I saw that, I would think I was an additional insured too, notwithstanding. And I think it tells you. It has information in that form. It talks about what the policy number is. It talks about the time. It talks about – it tells you who the – it just tells you who the carrier is. It puts all that in. And to say, oh, gosh, you can't rely on that, that's unreasonable, I think that's where the court erred in my view. Your Honor, I appreciate the extra time you provided me, and I will sit down. Thank you. Thank you. We will come down in group counsel and proceed directly to the next case.
judges: Allyson K. Duncan, Barbara Milano Keenan, James A. Wynn, Jr.